## THE KOREAN PRINCE.*

## THE TRANSFER NO. 20.

## THE N. Y., N. H. & H. R. CO. CAR FLOAT NO. 45.

(District Court, S. D. New York. January 9, 1924.)

1. **Collision ⬡⟲74—Evidence held to show tow collided with vessel, damaging vessel, without its fault.**

Evidence *held* to show that car float in tow of tug collided with vessel berthed at pier, damaging vessel's propeller and tail shaft, without vessel's fault.

2. **Admiralty ⬡⟲75—Answers to interrogatories under oath are admissions which answering party contradicts at his peril.**

Answers to interrogatories under oath are admissions by answering party, which he contradicts at his peril.

In Admiralty. Suit by the Prince Line, Limited, owner of the steamship Korean Prince, against the steam tug Transfer No. 20, her engines, boilers, tackle, apparel, etc., and the New York, New Haven & Hartford Railroad Company car float No. 45. Decree for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine and Frank A. Bernero, both of New York City, of counsel), for libelant.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for claimant.

GODDARD, District Judge. [1] This is an action brought by the Prince Line, Limited, owner of the Korean Prince, to recover damages to the steamer's propeller and tail shaft by reason of an alleged collision of car float No. 45 with that vessel while the former was in tow of Transfer No. 20 on the night of June 18, 1920. It differs from the usual collision case, because there is a denial by the claimant that any collision took place. At the time the Korean Prince was lying at Pier 7, Jersey City, in the slip between Piers 6 and 7. Her port side was next to Pier 7 and her stern was toward the river; her stern was about 50 feet inside of the end of the pier. The Korean Prince is 400 feet long, and her beam 52 feet 4 inches. The slip between Piers 6 and 7 is 150 feet wide. Pier 6 is 70 feet longer than Pier 7. Consequently the stern of the Korean Prince was 120 feet inside of the outer end of Pier 7.

Transfer 20, with car float No. 43 on her starboard side and car float No. 45 on her port side (the car floats were each 317 feet

long), left Brooklyn, intending to land the car floats at the bridges at Communipaw, N. J. The bows of the two floats were fastened close together, and the tug was between the floats at their after ends. However, all the bridges at Communipaw were occupied, and the tug was ordered to place the two floats on the south side of Pier 6. Transfer 20 proceeded to Pier 6. The libelant contends that, while engaged in this operation, car float No. 45 came in contact with the Korean Prince, damaging her propeller and tail shaft. Witnesses for the Transfer 20 testified that Transfer 20 proceeded to Pier 6, placed her starboard car float alongside the end of that pier, and made a line fast from the second bitt of the car float, which was about 50 feet from its bow, to a post on the south corner of Pier 6, this line being about 4 to 6 feet long; that the tug then swung the floats around to starboard until the starboard float was parallel with the south side of Pier 6, in other words, that the tug pivoted around the south corner of Pier 6; that the tug then backed out from behind the two floats, brought float No. 45 alongside of float No. 43, so that both were parallel with the south side of Pier 6. They further testified that no part of the tow came within 25 or 30 feet of the Korean Prince. This case presents purely questions of fact— whether there was or was not a collision, and, if there was a collision, did it cause the injuries claimed by the libelant?

No fault is attributed by the claimant to the Korean Prince, which was moored at a safe berth on the north side of Pier 7. The testimony of the libelant's witnesses is flatly denied by those of the claimant, and the court has not even had the benefit of observing all the witnesses, as the testimony of six of the seven of libelant's witnesses was taken by deposition. The libelant has produced one witness who saw the float as it hit the propeller and grazed the side of the ship; four witnesses, who were on the Korean Prince, felt the shock and ran up on deck, and saw the float and ship in contact; also two witnesses who were in their quarters on the ship below deck and felt the heavy shock as the float and ship came together. The claimant produced three witnesses on the trial who testified that there was no collision—a surveyor, who testified purely from a copy of the survey report; the ship's master, who testified on certain hypothetical questions; an employee of the New York, New Haven & Hartford Railroad Company, by whom an endeavor was made to explain

the failure to produce the tug's log book, etc.

In determining such a case as this, the probabilities and what might otherwise be minor circumstances must take an important part. The slip between Pier 6 and Pier 7 was 150 feet wide. The beam of the Korean Prince was 52 feet 4 inches; the tug was 26 feet; the car floats were 40 feet wide each; that makes a total of 158 feet 4 inches, or 8 feet 4 inches more than the width of the slip. The tug, however, was between the after ends of the car floats, and the forward end of the floats were together, so that at the forward end there would be a margin of 17 feet 8 inches between the car floats and the Korean Prince. This gradually narrowed down, and at the after ends of the floats, where the tug was between them, there would be, instead of a margin, an overlap of 8 feet 4 inches.

The occurrence took place about 10 o'clock daylight saving time; the captain of the tug had never been in the slip before, and could not, of course, see the conditions or what vessels were there, except with a searchlight. Perhaps it is not showing due regard to the skill possessed by the tugboat captain, but I think it might almost be said that, in attempting to take this tow into the slip under the existing conditions, the probabilities were that the tow would come in contact with the Korean Prince.

In answer to one of the libelant's interrogatories, the claimant stated as follows:

"The tug and tow approached the end of Pier 6 from upstream, landing the starboard side of the float No. 43 against the end of the pier. A line was then run from the third bitt of the starboard side of float 43 to the downstream corner of Pier 6. The tug then swung the head of the floats into the mouth of the slip. When No. 43 was parallel with the south side of Pier 6, and the after ends of the float were about 10 feet outside of the end of the pier, the tug backed from between the floats. The flood tide then carried No. 45 alongside of No. 43, and the floats were made fast to Pier 6. After the tug had backed from between the floats, her stern was permitted to swing upstream with the flood tide. The tug then came ahead and landed her starboard boat against the offshore end of No. 43, for the purpose of picking up the floatmen of the float and the deck hand of the tug. The floats were so moored on the south side of Pier 6 that their offshore ends were about 10 feet outside of the end of Pier 6."

[2] The claimant sought to avoid the consequence of the answer to this interrogatory by moving to amend the answer, but answers to interrogatories given under oath are admissions on the part of the party making the answer, which it contradicts at his peril. The Sagamore (C. C. A.) 247 F. 743, 745, 159 C. C. A. 601. If this answer to the interrogatory was true, and the floats were pushed into the slip until their sterns were only 10 feet beyond Pier 6, before the tug backed out between the floats, float No. 45 would have come in contact with the Korean Prince. The captain of the tug admitted that he had previously said that the ends of the float were only 10 feet beyond the end of the pier when he backed out, and upon the trial he testified that the floats were only 40 or 50 feet in the slip when he backed out, while Ruggles, an employee of and witness for claimant, testified that the floats were 150 feet in the slip when the tug backed out. In view of the admitted change in his statements, and also that both statements differ materially from that of claimant's own witness, the captain's accuracy must be doubted. Even on Ruggles' testimony that the floats were 150 feet in the slip when the tug backed out, it is evident that the float must have come extremely close to the Korean Prince.

The claimant failed to produce the tug's log book and letter of its marine superintendent to its tug captain when demanded by the libelant, and offered testimony to the effect that it had been lost in a fire which occurred on January 28, 1921. However, the captain testified that he had refreshed his recollection from the log, presumably to make the detailed statement, which, by admission of the proctor for the claimant, was taken about April 11, 1921, three months after the fire. This is unfavorable to the claimant, because either the captain did not see it and refresh his recollection, as he testified, or the log was not destroyed by fire. Although I doubt very much if the log would aid in deciding the case, for, when the captain of the tug was asked on cross-examination how he could remember all the details of the collision, he stated it was because he had refreshed his recollection from the log book, but later admitted that the log book showed nothing but that the tug landed there.

After the occurrence in the slip, the officers on board the Korean Prince called to the tug to ascertain the name. Ruggles, one of claimant's witnesses, admitted that he heard some man from the Korean Prince call

out and ask for the name of the boat that had struck it. Kelly, the floatman called by the claimant, testified in cross-examination that he heard the captain of the tug in reply say, "Go to hell; you are all crazy." The captain of the tug admitted that he heard them call out, and the only part he could understand was "Tug ahoy!" but did not pay any attention to it and got out. This action on his part would tend to cause suspicion that something had happened from which he wished to get away. .

From all of the above I conclude that there was a collision between car float No. 45 and the Korean Prince, and, as the two propeller blades which were injured were on the starboard side, the injury to them and to the tail shaft might well have been caused by it, and, as it appears from the testimony that shortly before the collision they were not damaged, I find that the injuries were sustained as a result of the collision.

Accordingly a decree may be entered in favor of the libelant, with a reference to ascertain the damages. .